# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of: | ) | |
| information associated with the Facebook account Grind At Godspeed, UID: 100014374597965 | ) ) ) ) ) | Case No. 19 - 970M (NJ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

- ■ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: 18 USC 1951(a), 924(c), and 922(g)(1).

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

ATF Special Agent Frank Rutter
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: November 21, 2019

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin     Nancy Joseph     U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Frank Rutter, being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION, BACKGROUND, TRAINING, AND EXPERIENCE

1.    I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and have been since 2015. As an ATF Agent, I have conducted firearms trafficking investigations involving violations of 18 U.S.C. § 922(a)(6), commonly referred to as "lying and buying" as well as investigations related to the unlawful use and possession of firearms by previously convicted felons in violation of 18 U.S.C. § 922(g)(1). Additionally I have conducted and participated in investigations involving violations of 18 U.S.C. § 924(c) (Use of a firearm in furtherance of crime of violence or drug trafficking crime). I have had a variety of formal, informal, and on the job training in the investigation of illegal firearms possession and trafficking. I have participated in the execution of search warrants in which firearms were seized; and I am familiar with the street name(s) of firearms and firearm related topics.

2.    I have been trained in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause. I have assisted in criminal investigations, participating in surveillance, interviews, and debriefs of arrested subjects. As a result of this training and investigative experience, I have learned how and why violent actors typically conduct various aspects of their criminal activities.

3.    This affidavit is based upon my personal knowledge, my training and experience, and on information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon police reports, surveillance videos, law enforcement surveillance, physical evidence recovered, and witnesses' statements that I consider to be reliable as set forth herein.

The facts of this Affidavit are based upon information obtained from my investigation, as well as information I have received from other law enforcement officers.

4. Based on the investigation to date, I submit that there is probable cause to believe that Maurice Tolbert and Richard Tolbert conspired to commit and committed the armed robberies of multiple cellular phone stores between October 2, 2019 and October 29, 2019, in violation of Title 18, United States Code, Sections 1951(a) (Hobbs Act robbery) and 924(c) (use of a firearm during a crime of violence). Additionally, there is probable cause that on or about October 7, 2019, and October 29, 2019, and several other dates, Maurice Tolbert possessed firearms after having been convicted of a felony, in violation of Title 18, United States Code, Section 922(g) (felon in possession of a firearm).

5. This affidavit is submitted in support of an application for a search warrant for Maurice Tolbert's Facebook account, for evidence of Tolbert's and others' involvement in the aforementioned robberies and illegal firearm possession.

6. More specifically, I seek authorization to search Facebook's information associated with Maurice Tolbert, who is the user associated with the Facebook account with the following user name and ID number:

| FACEBOOK NAME | FACEBOOK IDENTIFICATION (UID) |
| --- | --- |
| Grind At Godspeed | 100014374597965 |

7. The information I seek is stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California, from at least approximately December 1, 2017, to the Present.

8. Because this affidavit is submitted for the limited purpose of obtaining a search warrant, I have not included each and every fact known to me concerning this investigation. I have

2

attempted to set forth only the facts I believe are pertinent to establishing the necessary foundation for the warrant.

## II. PROBABLE CAUSE

9. On October 2, 2019, in the morning, an employee at the AT&T store located at 3543 South 27th Street, Milwaukee, Wisconsin, reported to the Milwaukee Police Department that at about 10:45 a.m. he had noticed a blue 4 door Hyundai Elantra backed in by a dumpster near the store. The car was occupied by two individuals who ducked down as he drove past them. Inside the store, the employee saw a black male approach the front door and attempt to open it. The employee stated that since a previous armed robbery on September 20, 2019, they keep the front door locked and only open it for customers. The subject then turned and walked away in the direction of the Hyundai. The employee left the store and drove thru the parking lot. He saw the subject getting into the passenger door of the Hyundai. The employee took a photograph of the blue Hyundai with his cell phone as the car left the parking lot

10. Based upon the witness description and the recovered surveillance footage, the driver was a black male, wearing black clothing and weighing approximately 240 pounds. The passenger was a black male, early 30's, 5'8" to 5'9" tall, approximately 200 pounds, dark complexion, wearing a white baseball cap, zippered gray hooded sweatshirt with "Everlast" across the chest, bleached/distressed style blue jeans, black gloves, and a black sunglasses.

11. On October 2, 2019, at approximately 7:49 p.m., two masked subjects entered the Sprint store located at 4550 South 27th Street, Milwaukee, Wisconsin. Subject #1 demanded an employee go to the back room of the store. Subject #2, armed with a black handgun, threatened the victims that if they moved he would shoot them. Subject #1 told Subject #2 to have the other victims moved into the back room. The subjects demanded the employee open the safe where the cellular telephones were kept. Once the safe was open, the cellular phones were placed into black

3

garbage bags. The subjects fled. Sprint was a business involved in interstate commerce at the time of the robbery.

12.     Based upon witnesses' descriptions and the recovered surveillance footage, Subject #1 was a black male, approximately 30 years of age, approximately 5'7" tall, approximately 365 pounds, heavy build, wearing a black hooded sweatshirt, gray pants, black shoes, gloves, and a black face mask. Subject #2 was described as a black male, approximately 25 years of age, approximately 5'10" tall, approximately 170 pounds, medium build, wearing a zippered gray hooded sweatshirt with "Everlast" across the chest, bleached/distressed style blue jeans, gloves, and a black mask. The firearm, which was brandished during the robbery, was described as a black, semi-automatic handgun.

13.     Law enforcement collected video from the Sprint store and conducted a canvas in the area, which resulted in several surveillance videos being recovered and reviewed. These videos captured the subjects exiting from and fleeing in a blue Hyundai Elantra.

14.     On October 7, 2019, at approximately 12:18 p.m., an armed and masked subject entered the Sprint store located at 1316 South 1st Street, in Milwaukee, Wisconsin. The subject was armed with a handgun. The subject demanded phones to be placed into the bag he produced. The subject ordered them to hurry or he would shoot. After the phones were placed into the bag, the subject fled and was observed entering a blue hatchback sedan parked in front of the store. Over 20 devices were taken in the robbery. Sprint was a business involved in interstate commerce at the time of the robbery.

15.     Based upon witnesses' descriptions and the recovered surveillance footage, the subject is described as a black male, approximately 230 pounds, heavy build, wearing a black ski mask, black hooded sweatshirt, gray jogging pants and gloves. The firearm, which was brandished during the robbery, was described as a black semi-automatic handgun.

Case 2:19-mj-00970-NJ   Filed 02/20/20   Page 5 of 23   Document 1

16.    Law enforcement collected video from the Sprint store and conducted a canvas in the area, which resulted in several surveillance videos being recovered and reviewed. These videos captured a blue Nissan Versa parked in the area before the robbery, from which the subject exited. After the robbery, the subject returned to the vehicle and put the black garbage bag in the trunk. The subject then drove away. The rear of the Versa had the make and model identifiers covered.

17.    On October 29, 2019, at approximately 11:34 a.m., two masked subjects entered the T-Mobile store, located at 1528 South 108th Street, West Allis, Wisconsin. One subject was armed with a silver and black handgun. The victims were forced into a back room of the store and told to lie down. A store employee was told to open the safe containing cell phones and another safe that contained cash. The phones were placed into black garbage bags. The cash, consisting of two $100 bills, two $50 bills, and rolls of quarters, was taken. The subjects then fled the store. T-Mobile was a business involved in interstate commerce at the time of the robbery.

18.    Based upon witnesses' descriptions and the recovered surveillance footage, Subject #1 was described as a black male, possibly in his 30s, 5'8" to 5'9" tall, approximately 250 pounds, wearing a gray ski mask, dark navy blue puffy jacket, and gloves. Subject #2 was described as a black male, possibly in his 30s, approximately 6'0" tall, approximately 200 pounds, wearing a gray mask, dark clothing, and gloves. The firearm, which was brandished during the robbery, was described as a silver and black semi-automatic handgun.

19.    Responding squads tracked the subject vehicle, identified as a blue Hyundai Elantra, which fled at a high rate of speed when officers attempted to stop the vehicle. As squads pursued the Elantra, it crashed in the alley in the 1300 block of South 37th Street, Milwaukee. Richard Tolbert exited the front passenger door and attempted to flee on foot but had a physical injury and was taken into custody. After a police perimeter was established and officers conducted a search of the area, Maurice Tolbert was taken into custody hiding in some foliage at the rear of

1313 South 35th Street. Law enforcement recovered the key fob to the Elantra where Maurice Tolbert was hiding.

20. The make and model emblems of the Elantra were covered with black electrical tape and a Wisconsin license plate, which was subsequently determined to have been reported as stolen, was attached over the Illinois plate registered to the Elantra, AZ-31096.

21. Along the flight path of the Elantra, officers recovered a loaded Taurus G2C 9mm silver and black handgun, bearing serial number TMD66339. This firearm had previously traveled in interstate commerce.

22. A Wisconsin State search warrant was executed on the Elantra. The items stolen from the T-Mobile were recovered in the trunk. Clothing, masks, and gloves consistent with the witnesses' descriptions and surveillance video in the T-Mobile robbery were located in the Elantra. Additionally, a black mask consistent with the masks worn in the October 2, 2019 and October 7, 2019 robberies was recovered from the Elantra. No personal cell phones were recovered.

23. A check of the Milwaukee County Criminal Justice Facility records for Maurice Tolbert reflected that A.P., 18XX West Wells, Milwaukee, WI, with phone number 414-865-3055 was listed as his emergency contact.

24. On November 1, 2019, at approximately 12:50 p.m., Maurice Tolbert called phone number 414-865-3055 from custody. During the recorded call, Maurice Tolbert identified the female as "Angel." He further provided her with the passcode to his phone, 329726, and information associated with his Apple ID (Grindfamily1@gmail.com, Lovelifeloyalty12). Based on that phone conversation, it was reasonable to assume that A.P. was in possession of Maurice Tolbert's phone and had access to Maurice Tolbert's stored iCloud information.

25. Based on my training and experience, I know that evidence of armed robberies is commonly found on the cellular phones belonging to the armed robber(s). This evidence often

6

includes web-based searches for cellular telephone stores, contacts with individuals who purchased the stolen devices after the robberies, photographs of robbery proceeds or firearms used, price lists for the stolen phones, communication with co-conspirators, discussions related to, and the source of, any weapons used, and other similar evidence. In addition, I know that evidence found on cellular devices is commonly backed up, or stored, in "cloud" type services in the event a device is lost, stolen or damaged. As a result, law enforcement seeks access to Maurice Tolbert's stored iCloud information.

26.     Records show that the recovered handgun, the Taurus G2C 9mm pistol bearing serial number TMD66339, was purchased by A.P. on October 6, 2019, the day before the October 7, 2019 Sprint robbery in which a consistent handgun was brandished. A.P. purchased the handgun at Dunham's Discount Sports, at 2550 South 108th Street, West Allis, WI. The purchase records reflect that A.P. provided her address as 11XX South Layton Blvd., Milwaukee, Wisconsin.

27.     Maurice Tolbert is a convicted felon, and is therefore not lawfully allowed to purchase or possess a firearm himself.

28.     On November 13, 2019, a Milwaukee Police Officer observed a gray Jeep Grand Cherokee with a REO Motors Dealer placard parked across the street from the apartment located at 508 North 28th Street. The Officer recorded the VIN on the vehicle as 1J4RR6GT8BC558075. A query of VIN 1J4RR6GT8BC558075 identified the registered owner as A.P., with listed address of 11XX South Layton Blvd., Milwaukee, Wisconsin, license plate AHC-6404.

29.     On November 14, 2019, law enforcement conducted surveillance at 508 North 28th Street, Milwaukee, WI. At approximately 6:40 a.m., officers observed A.P. exit the apartment and brush snow off the gray Jeep Cherokee bearing REO Motors Dealer placard. A.P. returned to 508 North 28th Street and exited a few minutes later with two children. They entered the Grand Cherokee and departed.

30.     On November 15, 2019, law enforcement officers executed a federal search warrant on the residence at 508 N. 28th Street, in Milwaukee. Various items of evidentiary value were recovered including, but not limited to, firearm boxes and records, ammunition, firearm magazines, cellular devices, and drug paraphernalia such as a "kilo press." Officers also recovered some of the clothing consistent with the clothing worn by one of the suspects in the October 2, 2019 robbery and the October 7, 2019 robbery.

31.     Additionally, A.P. was interviewed regarding her knowledge of and involvement in the criminal violations being investigated. During this interview, A.P. explained that she had purchased multiple firearms for her boyfriend, Maurice Tolbert, who she knew to be a convicted felon. Ultimately, A.P. admitted to purchasing at least five firearms for Maurice Tolbert. A.P. explained that she does not know how firearms operate, and would never have purchased a firearm on her own because she felt she did not need to own firearms. Maurice Tolbert accompanied her to the gun stores, selected the firearms, and provided the cash to purchase the firearms on all but two (2) occasions. Maurice Tolbert then was the primary owner of the firearm. A.P. explained instances when Maurice Tolbert would return home and state he had been robbed and someone had stolen his firearm which would lead to her purchasing another firearm for him.

32.     A.P. viewed still photos from the October 2, 2019 casing incident and robbery and the October 7, 2019 robbery. A.P. identified the suspect in the October 2, 2019 casing incident as someone who "favored" Richard Tolbert, although she had only seen Richard Tolbert on a couple of occasions. A.P. identified the firearm in the October 7, 2019 robbery as the firearm she purchased on October 6, 2019 from Dunham's for Maurice Tolbert.

33.     During the interview with investigators, A.P. provided her telephone number as 414-865-3055 and provided Maurice Tolbert's telephone number as 312-978-8447.

34.     Since A.P.'s interview, investigators have obtained firearms purchase records from several federal firearms dealers. In total, investigators have collected documents showing that A.P. has purchased at least six firearms since 2013. Those records reflect that on the following dates, A.P. purchased the following firearms:

a. January 6, 2013 – A.P. purchased one (1) firearm from Cabela's (FFL: 3-41-02642) located at 20200 Rogers Drive in Rogers, MN.

   i. Manufacturer: North American Arms, Model: Mini, SN: E244884, Type: Revolver, Caliber: .22

b. December 1, 2017 – A.P. purchased one (1) firearm from Cabela's (FFL: 3-41-04460) located at 8400 Hudson Road, Woodbury, MN.

   i. Manufacturer: Sccy Ind., Model: CPX-2, SN: 550661, Type: Pistol, Caliber: 9mm

c. March 11, 2019 – A.P. purchased one (1) firearm from Gander Outdoors (FFL: 3-31-09388) located at 6802 118th Avenue, Kenosha, WI.

   i. Manufacturer: Taurus International, Model: G2C, SN: TLO79819, Type: Pistol, Caliber: 9mm

d. April 11, 2019 – A.P. purchased one (1) firearm from Gander Outdoors (FFL: 3-31-09388) located at 6802 118th Avenue, Kenosha, WI.

   i. Manufacturer: Glock, Model: 26, SN: BGBS346, Type: Pistol, Caliber: 9mm

e. May 20, 2019 – A.P. purchased one (1) firearm from Gander Outdoors (FFL: 3-31-09388) located at 6802 118th Avenue, Kenosha, WI.

   i. Manufacturer: Taurus International, Model: G2C, SN: TMA80238, Type: Pistol, Caliber: 9mm

9

f. October 6, 2019 – A.P. purchased one (1) firearm from Dunham's (FFL: 3-39-17457) located at 2550 S. 108th Street, West Allis, WI.

    i. Manufacturer: Taurus International, Model: G2C, SN: TMD66339, Type: Pistol, Caliber: 9mm

35. On November 19, 2019, SA Rutter reviewed publicly viewable portions of Facebook accounts and located Facebook profile with vanity name "Grind At Godspeed" (Facebook User ID 100014374597965).

36. SA Rutter located a Minnesota Department of Transportation (DOT) driver's license image (dated 4/23/18) of Maurice Tolbert and compared it to the publicly viewable images on the aforementioned Facebook page "Grind At Godspeed" – ID 100014374597965. The images appeared consistent and to represent the same individual.

37. During further review of the publicly viewable portion of the Facebook page "Grind At Godspeed" – ID 100014374597965, SA Rutter located multiple links to a YouTube music video titled "HE SAY SHE SAY MR.GRIND F/ AK OF DO OR DIE (OFFICIAL VIDEO)." This video was posted June 20, 2019 by "Mr. Grind." In the video, Maurice Tolbert is in possession of what appeared to be a small Glock-style handgun with an extended magazine. Below are two (2) screenshots from the aforementioned video.





38.     The handgun shown in the video appears consistent with the Glock model 26 pistol

purchased by A.P. on April 11, 2019. Additionally, three (3) Glock 9mm magazines were

recovered during the aforementioned search warrant at 508 N. 28th Street in Milwaukee, WI on November 15, 2019.

39.     Based upon my training and experience, I know that individuals often post photographs and other messages containing information relevant to their involvement in crimes. For example, a search of Facebook will reveal photographs of Maurice Tolbert and others that are not publicly viewable and may portray Tolbert wearing clothing consistent with the one of the subjects in the robberies. In addition, individuals often post photographs or other information to Facebook identifying their whereabouts or reflecting their expenditure of robbery proceeds. Similarly, individuals who possess firearms often post photographs or other messages indicative of firearm possession to the Facebook account.

## III.    FACEBOOK INFORMATION

40.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

41.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

42.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual

Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

43. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

44. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

45. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also

provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

46. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

47. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

48. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

49. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

50. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes

14

stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

51.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

52.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

53.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

54.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

55.     Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

15

56. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

57. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

58. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

16

59. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or

Case 2:19-mj-00970-NJ Filed 02/20/20 Page 18 of 23 Document 1

consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

60. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## IV. INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

61. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment.

## V. CONCLUSION

62. Based upon the facts contained within this affidavit, I believe that probable cause exists to search Maurice Tolbert's Facebook Account, as further described in Attachment A, for further evidence of his and others' involvement in the armed robberies and illegal possession of firearms as described above.

## **ATTACHMENT A**

*Property to Be Searched*

To the extent that the information described in Attachment B is within the possession, custody, or control of Facebook, Facebook is required to disclose to the government the information, for the dates of December 1, 2017, to the Present, for the following account:

| FACEBOOK NAME | FACEBOOK IDENTIFICATION (UID) |
|---|---|
| Grind At Godspeed | 100014374597965 |

## ATTACHMENT B

### Particular Things to be Seized

## I.    Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

    a.    All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

    b.    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

    c.    All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

    d.    All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e.  All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

f.  All "check ins" and other location information;

g.  All IP logs, including all records of the IP addresses that logged into the account;

h.  All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i.  All information about the Facebook pages that the account is or was a "fan" of;

j.  All past and present lists of friends created by the account;

k.  All records of Facebook searches performed by the account;

l.  All information about the user's access and use of Facebook Marketplace;

m.  The types of service utilized by the user;

n.  The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

o.  All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

p.  All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of 18 U.S.C. §§ 1951(a) (Hobbs Act robbery), 924(c) (use of a

firearm during crime of violence), and 922(g) (felon in possession of a firearm) since December 1, 2017, through the Present, for the user ID identified on Attachment A, information pertaining to the following matters:

(a) The relevant offense conduct, any preparatory steps taken in furtherance of the criminal scheme, and communications between Maurice Tolbert and others related to the relevant offense conduct of cell phone store robberies or the sales of electronic devices or Maurice Tolbert's or others' possession of firearms.

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crimes under investigation;

(d) The identity of the person(s) who created or used the user ID; and

(e) The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of robberies or illegal possession of firearms.